Ms. Varner Good afternoon, Your Honors. Sarah Varner for Berton Mays. We're here today to discuss the denial of Berton Mays' motion for suppression at the district court. I think that there were some very important factual disputes before the district court judge, and I think that this was a close call for the district court. Even at the time of sentencing, the district court judge, in mentioning what she considered to be the blessings that were bestowed upon Mr. Mays during the course of this case, mentioned, maybe you win this case on appeal. The question that troubles me most in the case, and the question that I return again and again to, is, if Mr. Mays was not identified by the police until after he was arrested, and if the Second Amendment protects a citizen's right to bear arms, what was the crime that the officer believed Mr. Mays, what was the crime that he believed was afoot when Mr. Mays walked away from him in broad daylight? Terry authorizes an investigatory stop of a citizen based on a reasonable suspicion that criminal activity is afoot. That suspicion must be more than a hunch. The purpose of that stop is to verify or dispel the suspicion that criminal activity has happened or is about to happen. So, put yourself in the position of Mr. Mays on that day if you can. Mr. Mays walked away from a fight which all parties agree he had no involvement in broad daylight at about 6 p.m. in Indianapolis. All parties agree that there was no reasonable suspicion to engage in anything beyond a consensual stop at that point. Mr. Mays was walking. He was not running. He had no torn clothes. He had no visible injuries to himself. There was no reason to think he was involved in the fight whatsoever. He was walking away with his hands in his pockets. A citizen may walk with their hands in their pockets. He did not comply with the police officer's orders. But at this point, there is no reason why Mr. Mays had to comply with the police officer's orders, and that does not alone furnish reasonable suspicion. He was cursing at the police officer. Now, while that is obviously probably not the best course of action to take with a police officer, that is also not illegal. The police officer believed his body to be angled away from him as he walked, causing him to believe that Mr. Mays may have been carrying a weapon. That is not illegal. He did not know Mr. Mays at that point was a person who could not carry a weapon. So taken together, there are no facts that provide reasonable suspicions that a crime was afoot at that time. There's nothing that links Mr. Mays to criminal activity at that moment. Now, the government... I'm going to ask you to help me with the record. As the officer comes upon the scene of this man and woman involved in the tussle, is there anyone else that Mr. Mays similarly situated in the so-called spectator role? The record does not say that anyone else was there at the time. So we've got an officer who has a scene. There's very few people at the scene. Correct. In fact, there's just four people at the scene. Correct. The two that are involved, the one that... Well, I guess three in the sense the individual is trying to pull. And there's another solitary figure there. Yes, Your Honor. Yeah, so... And that's true. And at that point, there was reason to try to stop Mr. Mays on a consensual basis and say, Hey, we saw you standing there by that fight. Can you tell us what happened? But Mr. Mays was under no obligation to stop. And he, albeit not as appropriately as he could have, he vehemently indicated to the police that he did not desire to speak with them, and he simply walked away. And all parties agreed that he was well within his rights to do that at that point. Reasonable suspicion should not be based on circumstances that otherwise describe legal activity. And that's exactly what we have here. Now, the next issue we get to is what's the standard for a stop, reasonable suspicion? The next standard is what's the standard for a frisk? Where an officer has a reasonable suspicion that criminal activity is afoot, the officer may stop and search for weapons, search the person for weapons, if there's a reasonable suspicion that that person is armed and dangerous. Though the government implies that it's not in their brief, it is a separate standard. A frisk is much more of an intrusion into a person's private life. So it must be justified separately from the stop. And the fact that Mr. Mays walked away with his hand in his pocket may, after reasonable suspicion had been established to stop him, may have supported the officer frisking Mr. Mays, but it did not support the officer stopping Mr. Mays. And both the government and the district court relied very heavily on the standard for a frisk rather than the standard for the stop. Both the government and the district court cited the Oglesby case and the district court cited Patton. And the district court cited Patton within the section of their order discussing whether reasonable suspicion existed. What's important to know about both of those cases is both of those cases, the defendants in those cases were already engaged in illegal activity. They were violation of city ordinances. I think one was drinking on a sidewalk. So the officer already had reasonable suspicion to engage in the investigatory stop of those persons. Those cases centered on whether or not the frisk was appropriate in those cases. So the government's reliance, the district court's reliance on that standard is an error. The final issue that I want to address is at what point the seizure happened, because I know your honors have noticed that we raised clear error against the district court on the basis of what exactly happened at those moments where Officer Lepsky finally confronted Mr. Mays. An individual is seized when he submits to a show of authority by an officer that would lead a reasonable person to believe that they are not free to leave or when an officer applies physical force no matter how slight. Now I think when I was reviewing for this case last night, I sort of fault myself that I didn't point out in my brief strongly enough, we actually had two changes in this story, two significant changes. We have the first story, which we relied on in our brief, and that first story can be thought of as where Officer Lepsky approaches Mr. Mays from behind. He doesn't mention anything about touching him. He just mentions that he pulls his taser out because he believes Mr. Mays is armed. Now the second significant change to that story actually comes when the government replies to Mr. Mays' motion to suppress, and when as a part of that motion to suppress, they submit an affidavit from Officer Lepsky. At that point, the story changes to Officer Lepsky approaches Mr. Mays from behind, pulls his taser, and he says, I didn't know, I felt like something was going to happen. Sorry, I'm reading the wrong section here. He approaches Mr. Mays from behind. He pulls his taser and asks Mr. Mays to turn slowly around. Mr. Mays refuses, and then at that point, he places his hand on Mr. Mays' shoulder. Mr. Mays does not turn. At that point, he's seized. And that's the difference in this story is the placing of the hand on the shoulder. Yes. Because I think the most important fact in this case is, does Mr. Mays turn to confront the officer, or does he not? And that involves the touch. Because if he never turns to confront the officer, then we don't have reasonable suspicion in this case because Mr. Mays was perfectly entitled to be a citizen who walked away from the scene of a fight with his hand in his pocket, maybe having a gun. That was all perfectly appropriate on his part. But it's only if you believe the fact that was presented only at the time of the suppression hearing, that was the third story, that Mr. Mays turned to round on the police officer and that the police officer had to touch him in order to stop him from turning. Because that's the only point when we believe that there may have been a crime afoot. And that crime that might have been afoot is he's got all these facts to maybe lead him to believe that Mr. Mays is armed. He could be armed. But the only time when there might be criminal activity is if he believes at that point he's turning to round on him and he might be about to confront him with violence. So I think that if this court, a reasonable approach would be to believe the second story, the story presented by the government in their response to the motion to suppress and supported by the affidavit filed by the officer in support of their objection to the motion to suppress. And I see I'm entering my rebuttal time, so I'll reserve the rest of my time. One quick question, if you will. Is there a dispute about whether Mr. Mays rounds or turns to face the officer? I understand there's a dispute about the touching, but is there a dispute about the fact that he rounds to face the officer? I think that there, in the first version of this, it just depends on what, yes. In my estimation, yes. He does not, in the first credible version of the story, he never turns around. He simply stops and complies. Even in the second version of the story, when the government replied to the motion to suppress, he's touched, but he's not turning until after that point. So he does eventually turn, but the point, I guess, is when and with what intent. Ms. Varno, just one question. You think it would be unreasonable for an officer approaching this situation to conclude that there's a possibility an individual like Mays is involved in some way in the assault? I don't think that, that's difficult to say. I think the facts that are in front of this court at this point is that all parties agree that there was no reasonable suspicion to believe he was involved at that point. And so that's the crux that we have in front of us today, that everybody agrees no reasonable suspicion existed when he walked away. The only thing the police were entitled to do was a consensual stop. Okay. Thank you, Ms. Varno. Thank you. Ms. Pryor. Good afternoon, Your Honors. May it please the Court, Doris Pryor on behalf of the government. The issue presented before the Court today is whether or not Officer Lepsky had reasonable suspicion to stop Mr. Mays. The facts of this case, which are to be reviewed under clear error, establishes clearly that he did. Let's start at the beginning. Officer Lepsky approached a crime scene and was informed by the officer at that time there were four individuals here. However, the man you see walking down the street, Mr. Mays, just left. I need you to go and stop him and question him about what happened. Exactly what did the first officer on the scene say to the second one? Is that a direct quote? Did he say, I need to question him, or did he just say, get a hold of him? I need to question him, Your Honor. And I can go grab the transcript, but we need to question him. And Officer Lepsky had observed Mr. Mays leaving the scene of the incident. It was broad daylight in a high-crime area, and Mr. Officer Lepsky attempted to question him. Police officers don't need to. So your view is the second officer didn't know why the man needed to be questioned, whether he was a witness or whether he was involved? It was understood, Your Honor, that Mr. Mays at the time was a witness. Why was that understood? Well, because he said, I needed officer, the first officer, Officer Coffin, told Officer Lepsky, I need you to question Mr. Mays. And that necessarily means he was a witness and not a participant? Yes, Your Honor, because the understanding that Mr. Coffin explained to why he needed him to question him, he was here at the fight, and I can go, and let me get the exact language of what Mr. Coffin said, but the understanding was he was not a part of the assault. He was simply a witness. Will you go and question him? Police officers don't need reasonable suspicion to approach an individual on the street and attempt to ask that person questions. Reasonable suspicion is not required until a person has been seized. The question is, a person is not seized, if the person is not seized for purposes of the Fourth Amendment, unless it is affected through either physical force or of a sure authority and submission to that authority. The facts of this case demonstrate that Mays did not submit to Officer Lepsky's show of authority. Instead, Mays continued walking ahead of the officer, yelling profanity over his shoulder, and refusing to take his hands out of his pocket. Because the seizure is not a continuous act, but a single one, the lower court was correct in finding that the seizure did not occur until Officer Lepsky placed his hand on Mays' shoulder. At no point before that physical touching did Mays submit to Officer Lepsky's show of authority. Reasonable suspicion. What did Officer Lepsky have at the time that he placed his hand on Mays' shoulder? Under the totality of the circumstances. That's the analysis. Not to piecemeal it apart, but under the totality of the circumstances, at the time that he touched him, what did Officer Lepsky know? He had reasonable suspicion that Mays was, that first Officer Lepsky knew that he was patrolling in a high crime area. Mays was part of a group that was openly violating the law. Mays was the only one out of the group that singled himself out by walking away when asked to stop by police. The district court was correct that Mays simply walking away was allowed. However, as the district court stressed, it was not that Mr. Mays simply walked away, or simply told the officer, I refuse. It was what happened, what facts was Officer Lepsky observing on Mr. Mays walking away? After refusing to submit to a show of authority, Mays is walking in front of Officer Lepsky, yelling over his shoulder, and becoming more and more agitated. Officer Lepsky continued to follow Mays and try to engage him in a consensual encounter. As defense counsel admitted at the suppression hearing, this was not unreasonable or unlawful for Officer Lepsky to do, and this occurred over a short, short window of time. It was during this window of time that Officer Lepsky asked Mays, will you remove your hands out of your pocket? Mays removed his left hand, but refused to remove his right hand. At this point in his training and experience, Officer Lepsky notices that Mays is blighting the right side of his body, attempting to shield it from the officer. His tone is becoming more combative and more agitated. And Mr. Mays is beginning to take this aggressive stand. As the court found, at that point, it was reasonable for Officer Lepsky to suspect that Mays was possibly concealing a weapon. And under Indiana Code 35-47-2-1, that is violation of law to conceal a handgun without a license, and would have been justified in instigating a Terry stop at that time. The court conducted that analysis. Next, the court went on to say that the third time that Mr. Officer Lepsky asked Mays to remove his hand from his pocket, again Mays refused and suddenly stopped moving forward and began to turn in a circular motion, directing further obstructing Officer Lepsky's view of his right side. Because of his concern that Mays might have a weapon in his right pocket, Officer Lepsky then put his left hand on Mays' right shoulder and shortly thereafter saw a gun in Mays' right hand. It was not until this point that there was a seizure, and now Officer Lepsky had reasonable, individualized suspicion for both the Terry stop and the Terry frisk. As Mays continues to turn around, Officer Lepsky observes Mays removing a firearm from his right pocket, unless Officer Lepsky is able to tase him. For these reasons, Your Honor, we believe that the district court was correct in its analysis, that at the time that Mr. Mays was seized, there was reasonable suspicion that he was engaged in criminal activity, concealing a handgun without license, and more importantly, that at the time that he began to turn around and Officer Lepsky placed his hand on his shoulder, that there was reasonable suspicion that he was armed and dangerous. The critical distinction, then, between the government's position and Mr. Mays' position is that the crime that was afoot was not possession of a gun by a felon, because the defense has discounted that because the officer didn't know he was a felon. It was possession of a concealed weapon without a license. Yes, Your Honor, and the court did find that in its order. Now, did the officer have reason to believe that Mr. Mays was not licensed? No, he did not. The level is reasonable suspicion. Was it reasonable that someone behaving in this manner, potentially, that there was criminal activity afoot? Let me ask one other question. Let's say the stop had been illegal, that it was not a reasonable suspicion on the concealed weapon. If after an illegal parry stop, Mr. Mays had rounded toward the officer in a threatening way with a gun in his hand, despite the fact that the initial stop was illegal, would we have to suppress the gun if Mr. Mays threatened the officer with a gun, despite the illegality of the parry stop? I would say, Your Honor, if the court determined that there was an illegal seizure at that point, I agree with the defense that U.S. v. Smith would come into play. And under the analysis of U.S. v. Smith, 794-536-81, I believe that this seizure would have satisfied the factors outlined in Smith. Because in Smith, unlike the facts here, in this case, his path or freedom of movement was never physically obstructed. He was approached from behind, so he was free. He understood that a reasonable person would understand that he was free to go. And I believe that the show of authority at that point, he did have a reasonable suspicion. Thank you. If the court has nothing further, the government would request that you affirm the finding of the district court and affirm the judgment. Thank you. Thank you, Ms. Briner. Ms. Briner? I just want to point out one quick thing here. Never does the district court say that there was a reasonable suspicion that the criminal activity afoot was carrying a handgun without a license. That's not in the record. What the district court said was cited Oglesby, which is the Frisk standard, and says that it was reasonable for Officer Lepsky to infer that Mr. Mays was attempting to conceal a weapon in his right pocket by angling the side of his body away from Officer Lepsky. Cite Oglesby. And then it says, then the district court says, then further cites Patton saying, yeah, it's true that the officer hadn't seen the gun at that point, but Terry rejects the notion that an officer must be certain that the individual is armed for reasonable suspicion to exist. Again, cite the Frisk standard. There was no reasonable suspicion at the time that Mr. Mays was illegally stopped to believe that criminal activity was afoot. Mr. Mays vehemently expressed his desire not to speak with the police, and for these reasons we would ask the court to reverse the district court's ruling on the motion to suppress. I'll ask you the same question I asked the government's counsel, and that is if the Terry stop had been illegal and Mr. Mays threatened the officer with the gun, would we have to suppress the gun? Your Honor, I believe so. I don't have a case site and I don't have research to support my view on that right now, but I believe that everything that follows after that illegal stop would have to be suppressed, and I can submit a further brief if the court desires. I don't think that will be necessary, but we'll ask for it if we need it. Okay. Thank you, Your Honors. Thank you, Ms. Varner. Thank you, Ms. Breyer. Case is taken under advisement. The court will stand at recess. Thank you.